R. F. BECK, TAX-COLLECTOR, v. C. B. ALLEN.

| | |
|---|---|
| 58 | 143 |
| a77 | 197 |
| 77 | 274 |
| a77 | 289 |
| a77 | 308 |
| 58 | 143 |
| 78 | 573 |
| 78 | 579 |
| 78 | 686 |
| 58 | 143 |
| j87 | 118 |
| 58 | 143 |
| j93 | 717 |

1. BOARD OF SUPERVISORS. *Minutes not signed before adjournment. Omission, how remedied.*

Under sect. 1361 of the Code of 1871, it was not necessary that the minutes of proceedings of a Board of Supervisors should be signed by the president of the board before the adjournment of the meeting; and, although that was the regular and proper course, if it was not pursued in any instance, the failure might be remedied by an approval of the unsigned minutes by the board at its next succeeding meeting, and the signing thereof by the president of the board; and such subsequent approval and signing would also have the effect of making the minutes valid, as if originally regularly made at the latter term.

2. SAME. *Failure to levy taxes at prescribed time. How remedied.*

Sect. 2154 of the Code of 1880, which provides that in case the Board of Supervisors fail to levy the county taxes at the time fixed therefor by law, a special meeting may be called as early as practicable for the purpose of making such levy, was not intended as a requirement that in such circumstances the levy should be made only at a special meeting, but as a provision for the speedy compliance with the duty of making the levy; and if, upon such failure, no special meeting should be called, it would be the duty of the board to make the levy at its next regular meeting. To subserve the object of this provision, the levy should be made at the first meeting, regular or special, after the omission to levy at the prescribed time.

3. SAME. *Mode of allowance of claims. Invalid warrants as ground of injunction.*

Sect. 5 of "An act in relation to county finances," approved February 1, 1877, required that the yeas and nays should be recorded on every allowance made by the Board of Supervisors, and that the order should cite the particular statute under which it was made, and prohibited the clerk from issuing warrants on allowances made in disregard of these provisions. But, although warrants issued in violation of this statute are void, the fact that taxes have been levied in part for the payment of such invalid warrants is no ground for an injunction against the collection of the taxes, because it is the duty of the Board of Supervisors to levy, within the limits prescribed by law, taxes sufficient to pay all the valid debts against the county, and the claims on which the warrants were issued may be valid debts, notwithstanding the

illegal allowance of them. The allowance does not create the debt, but is only a recognition of it; and an invalid recognition, though insufficient to authorize its payment, cannot invalidate a rightful demand.

4. SAME. *Contracting illegal debts. Injunction against collection of taxes. Chancery pleading.*

A Board of Supervisors has no authority to contract to pay out of the general revenue of the county for the building of public roads, nor for "extra services" rendered by members of the board in letting out contracts for making roads and bridges and in examining the work done, nor for contracts to build bridges let out by the individual members of the board in vacation; but a bill filed against a sheriff alone for an injunction to prevent the collection of the county taxes cannot be maintained on the allegation that the claims for which the taxes were levied were "in great part" illegal, because contracted by the Board of Supervisors in the circumstances above indicated, for the reasons (1) that the allegation does not specify the particular claims which are denounced as illegal, and (2) that the claimants are not made parties defendant to the bill.

5. TAXES. *Injunction against collection. Illegal claims. Remedy against payment.*

The collection of county taxes levied within the limits prescribed by law should not be enjoined on the allegation that the levy was excessive, because partly made to pay claims alleged to be invalid; for, if the injunction should be granted, the allegation might prove to be unfounded, and that at a time when it would be too late to collect the taxes for that year, whereby great confusion would arise in the administration of county finances. The remedy of the tax-payer against the payment of such invalid claims is to enjoin the treasurer from paying them, or, when their allowance by the Board of Supervisors appears upon the minutes of the board to be illegal, by notifying the treasurer of such illegality, who would then, if not without the actual notice, be bound to withhold payment.

6. SAME. *Special. Warren County bonds. Repeal. Obligation of contract.*

The legislative acts on p. 657 of the Laws of 1871, and on p. 360 of the Laws of 1878, authorizing the Board of Supervisors of Warren County to issue certain bonds and to levy special taxes for their payment, were not repealed nor affected by the act of 1880, entitled "An act in relation to public revenue," which limits the levy of county taxes, together with the State tax, to $15 on every $1,000 worth of property. The former acts confer the power to levy special taxes in addition to, and outside of, the general limit prescribed by law; and, being local acts, they are not presumed to be within the general words of repeal used in the general statute of 1880 above referred to. But the special taxes mentioned in the acts of 1871 and 1878 were intended as a security for the bonds therein authorized to be issued, and the due collection thereof by the county was a part of the obligation of the contract contained in the bonds.

7. SAME. *Special. Local and general revenue acts construed.*

The special tax authorized by sect. 2 of the act of 1873 (on p. 321 of the Laws

of 1873) to be levied in a certain school-district in Warren County is not within the limitation of the act of 1880 above stated, because that applies only to counties, and not to any particular district or districts of a county. But the special tax authorized by sect. 4 of the act of 1873 is expressly restricted within the limits prescribed by the general laws of the State in relation to county taxes, and, therefore, is embraced within the limitation of the act of 1880.

8. SAME. *For bridges, etc. Included within legislative limitation.*

The act of the Legislature "in relation to public revenue," approved March 6, 1880, contains the following provision: "Boards of Supervisors are hereby prohibited from levying taxes which, added to the State tax, will exceed twelve dollars and fifty cents on each thousand dollars of taxable property; *provided*, that to meet any outstanding indebtedness the amount herein provided may exceed, but in no case shall the total tax exceed, fifteen dollars on each thousand dollars' worth of property." It was intended by this provision to limit within the rate of taxation here prescribed the levy of taxes for building bridges and for the other purposes mentioned in sect. 16, Art. XII., of the State Constitution, and any such levy being in addition to and outside of this limitation is in violation of this statute.

9. SAME. *For bridges, etc. Power of Board of Supervisors. Sect. 16, Art. XII., of State Constitution construed.*

Sect. 16, Art. XII., of the State Constitution provides as follows: "No county shall be denied the right to raise, by special tax, money sufficient to pay for the building and repairing of court-houses, jails, bridges, and other necessary conveniences for the people of the county, and money thus collected shall never be appropriated for any other purpose; *provided*, the tax thus levied shall be a certain per cent on all taxes levied by the State." This provision does not confer upon the county Boards of Supervisors the right, exclusive of legislative control, to levy special taxes in whatever amount they may deem proper for the purposes therein specified, but it must be considered as a direction to the Legislature not to withhold from the counties the right to levy sufficient taxes for the purposes mentioned. And this right, thus guarded, may be regulated and restricted by the Legislature, provided the rate of taxation prescribed be sufficient for the purposes enumerated in the section above quoted; and of the sufficiency thereof the Legislature must determine. (CAMPBELL, J., dissented.)

10. SAME. *Sect. 16, Art. XII., State Constitution, construed. Opinions of the several judges.*

As to the power conferred by sect. 16, Art. XII., of the State Constitution upon county Boards of Supervisors to levy taxes for the purposes therein. mentioned, GEORGE, J., *held*, that the Legislature is commanded not to deny or refuse to grant to counties the power to levy taxes sufficient for those purposes, of which sufficiency the Legislature is the judge; and until such power is granted by the Legislature the counties do not possess it. CHALMERS, C. J., *held*, that the Legislature is forbidden to withhold from the counties the right to levy taxes sufficient for the purposes enumerated in

said section, and if that body prescribes a limit of taxation it must be observed, unless it be a total prohibition of taxes; but if no limit be prescribed by the Legislature, such right of the counties is unrestricted. CAMPBELL, J., *held*, that the section referred to empowers the county Boards of Supervisors to levy taxes sufficient for the purposes therein named, and makes those boards the judges of the sufficiency of the taxes; and it excludes the right of the Legislature to limit or restrict the exercise by such boards of the power which it confers.

APPEAL from the Chancery Court of Warren County.

Hon. U. M. YOUNG, Chancellor.

The case is stated in the opinion of the court.

*Pittman, Pittman & Smith*, for the appellant.

Sect. 1361, Code of 1871, in relation to proceedings of Boards of Supervisors provides that "the minutes of each day shall be read and signed by the president." This section or clause was in the Code of 1857, and received a construction of the Supreme Court in the case of *Arthur* v. *Adam & Speed*, 49 Miss. 408. The court in that case decided that this statute is directory merely, and "its omission does not invalidate the proceedings;" and that, while the omission to sign the minutes by the president "indicated carelessness, if not incapacity, it did not affect the validity and legal effect of the acts of the board." Even if this were not so, the entry of October 4th undoubtedly made the former order a good *nunc pro tunc* order, as the omission to write up the minutes before the board adjourned was due to an act of the court, and every court has an inherent power to remedy, by such entries, any omission or neglect on its part. See 2 Bouv. L. Dic. 247, tit. "Nunc Pro Tunc," and cases cited.

If the action of the board, however, was void as relating to the meeting of September 9th, then it became a good levy as of October 4, 1880. See sect. 2154 of the Code of 1880.

The bill, by vague, uncertain, and indefinite allegations, seeks to have certain warrants declared illegal and void though it does not specify which warrants are sought to be so declared void, but makes a lump or bunch of the whole mass, and says that ninety-five per cent of them at least are void. We submit

that this cannot be done in a proceeding of this kind, even if the allegations were specific and definite enough to make an issue upon.

The authority invoked by the counsel for the appellee is found in an opinion of Judge Campbell, in the case of *Klein* v. *Supervisors*, 51 Miss. 813, in which he says, in speaking of allowances made in violation of sect. 1382, that " an illegal or excessive allowance, or warrant issued upon such allowance, being void, may be questioned anywhere, by anybody, and in any proceeding."

This language of Judge Campbell evidently refers to allowances made in violation of said sect. 1382 of the Code of 1871, and when he revised this section in the Code of 1880 he took pains to so limit his language as to its intent and scope, by providing that " such illegal allowance may be inquired into by the proper tribunal, *upon legal proceedings for that purpose.*"   See Code 1880, sect. 2160.

Can it be said that a proceeding to enjoin a tax-levy is a proceeding to attack and inquire into the validity of warrants? Besides, what validity would a decree have, even if it should be made in this cause, decreeing that the warrants in question were void?   The holder of the warrant is not a party to this proceeding, and he would in no way be bound by the decree. We submit that the proceeding spoken of by the court must be a proceeding to which the holder of the warrant is a party, either directly or by his representative, and that it must be a proceeding for " that purpose "— to wit, to attack and set aside the warrant.

The section of the law relied on by the appellee is sect. 5 of a law of 1877 relating to county finances ; and, while it requires that the votes for and against allowances shall be recorded on the minutes, yet it is the plain intention of the statute that this shall be done only when there is a division in the board ; and it cannot be said with any reason that there is any obligation imposed by the act to record all votes, even when there is no division among the board as to the allowance of the claim.

And when nothing appears in the minutes to show that no member voted against the allowance, then it is a fair and a reasonable presumption that all the members voted in favor of the allowance.

Besides, this section is directory merely, and does not render the warrant void. It is a prohibition on the clerk, but it does not declare that the warrant is illegal and void.

But suppose the view taken by counsel for appellee, of this statute, is correct, still the original consideration is good, and the indebtedness still exists against the county; for it cannot be said that to take a void warrant will satisfy a valid debt. And we submit that the court will not say that a levy should be enjoined merely because the board propose to pay a valid debt which is evidenced by an invalid warrant.

In regard to the allegation that "a large portion of the warrants are for allowances to the members for what they call 'extra days' service,'" we say that this allegation is too vague and indefinite for the court to proceed upon; and if it were duly made, the court cannot inquire into it in this proceeding. It does not say what warrants are invalid, what members of the board they were issued to, what are the amounts of such warrants, what are the dates and numbers, nor even what per cent of the general warrants they compose. How can the court render a decree upon such allegations as these? And, moreover, would this decree be valid and binding on the holder of the warrant when he is no party to the proceeding in which the decree is rendered?

The allegations in reference to the warrants issued, as alleged, upon contracts to build and repair public roads are open to the same objections as above stated, and, moreover, there is no allegation that any of the contracts are in excess of $100, or that the members were authorized to make them in vacation by the board; but, for aught that appears on the face of the bill, and as in fact and in truth was the case, these warrants were for work required in sudden emergencies, such as the washing away of culverts and bridges, the caving in of

embankments, etc., caused by violent rains, and, the overseers of the roads refusing to do the work, the member had it done and reported his action to the board, and this action was approved and the warrant issued.

In the case of *Klein* v. *Supervisors*, 51 Miss. 807, the Supreme Court construed the act of limitation of 1875, and on p. 815 used the following language : —

" But it is not lawful for the board, as against such warrants, to exhaust its power to levy for any year by embracing in the aggregate a levy for those purposes for which its power *is not subject to legislative restriction*, — *i.e.*, ' to pay for the building and repairing of court-houses, jails, and bridges,' as provided by Art. XII., sect. 16, of the Constitution, — *or for which it was authorized by law to make a special levy, independent of the limitation.*"

The bill on its face shows that five mills of the levy made on September 9, 1880, were under authority of Art. XII., sect. 16, of the Constitution, and that six mills of the levy were under the authority of special acts authorizing " special levies," and are, therefore, " independent " of the limitation act of 1880 ; because, to use the words of the Supreme Court, the Legislature has no control over the power of the board as to these, or, to use the exact words of the court, the power of the board as to these " is not subject to legislative control."

In the case of *Butz* v. *City of Muscatine*, 8 Wall. 575, the Supreme Court of the United States, in construing a similar act of the Legislature of Iowa limiting the power of the city authorities of the city of Muscatine to a levy of one per cent, held that " this is a limitation touching the exercise of the power of taxation in the ordinary course of municipal action." This construction has evidently been followed by our court in *Klein* v. *Supervisors*, 51 Miss. 807.

Suppose that the board had seen fit to levy only fifteen mills, and, on the theory that this would only provide for the wants of the county in relation to its ordinary expenditures, had made no provision for these bonds. It is certain that, upon

a *mandamus* for the purpose of compelling a levy to provide for these bonds, it would be no answer to say that the board had exhausted its power to levy conferred by the act of March 6, 1880.

As this court had already decided that when the board has authority to make a special levy, independent of the limitation, — that its power was not subject to legislative restriction when this act was passed, — this act of March 6, 1880, must be construed in the light of that act, and the words "outstanding indebtedness" must be construed as applying to indebtedness other than that for which the board was authorized to provide by special levy.

*Murray F. Smith*, of counsel for the appellant, argued the case orally.

*Cowan & McCabe*, for the appellee.

The first ground upon which the court was asked to enjoin the collection of the tax was, that the order of the Board of Supervisors which purports to levy the tax for county purposes is absolutely void.

The proceedings of the board were not reduced to writing by the clerk nor signed by the president until several days after the final adjournment of the board for that term. Sect. 1361 of the Code of 1871 provides that "it shall be the duty of the clerk of the Board of Supervisors to keep and preserve a complete and correct record of all the proceedings and orders of the board. * * * The minutes of each day shall be read and approved by the president," etc.

The obvious intention of the law-makers in requiring a complete and correct record of the proceedings, and having each day's minutes read and signed by the president, is to verify the acts of the board done in its official capacity. It is not intended to make the mind or memory of either the clerk, the president, or of any member of the board, the repository of the official acts or proceedings. Sect. 1354, Code of 1871, provides for the election of a president *pro tem.* in the absence of the president, and sect. 1362 for the appointment of a clerk

*pro tem.* Both of these *pro tem.* officers are *functus officio* at the adjournment of the term. It will not be contended that this clerk *pro tem.* could write up and record the minutes after the adjournment of the term, when he is no longer clerk, or that the president *pro tem.* could read them over and sign them after the term, when his office had expired. It would be an absurdity to claim that the regular clerk could make the record of the proceedings after the adjournment, in such case; because, not being present, he would not know what had been done, and would not, therefore, know what proceedings to record. The regular president could not read over and sign the minutes in such case, as he would be in total ignorance of what had transpired in his absence, and would consequently be undertaking to verify something about which he could know, officially, absolutely nothing. See reasons given in Judge Campbell's dissenting opinion in *Cornwell* v. *The State*, 53 Miss. 392.

The doctrine is well settled that courts of record have no power through any of their officers to alter, amend, write up, or interfere with their minutes after the adjournment of the term, unless such power is expressly conferred by statute. *Coopwood* v. *Prewett*, 1 Geo. 206. See also *Kane* v. *Burrus*, 2 Sandf. 313; *McGuillon* v. *The State*, 8 Sandf. 595; *Cachute* v. *The State*, 50 Miss. 170.

But it is contended that the reading and approval of the minutes at the special term in October gave them validity, as if they had been written up and signed at the September term. This is trusting too much to the memory of individual members, and is not authorized by law. *Cornwell* v. *The State*, 53 Miss. 389; *Lane* v. *Withers*, 46 Miss. 667. The board might have made a valid levy at the October term by treating the September attempt as a nullity, but had no power to give validity to a void proceeding of the September term.

The Boards of Supervisors of the several counties of the State derive their power to levy taxes from two separate and distinct sources, viz., the statutes and the Constitution. From

the statutes they derive the power to levy taxes sufficient to meet the necessary demands of their respective counties. Code 1871, sect. 1363. From the Constitution they derive power to levy taxes sufficient to build and repair court-houses, jails, and bridges. Const., Art. XII., sect. 16. These are the only sources from which they derive any power to levy taxes, and if they exceed the powers acquired from these sources their action is void. *Howe* v. *The State*, 53 Miss. 57.

Now, while the power to levy taxes is conferred upon these boards both by the statutes and by the Constitution, it is not to be exercised at pleasure, or according to the judgment or caprice of the boards, *but according to law*. In the exercise of the powers conferred upon them, both by the statute and the Constitution, they are subject to the control of the Legislature, and must conform their action in the exercise of these powers to the requirements of that body. A failure to do this renders their acts void. *Board of Supervisors* v. *Arrighi*, 54 Miss. 668. The Legislature, having conferred upon them power to levy a tax, undoubtedly had the right to say *how* that power should be exercised. 51 Miss. 807. The Constitution having conferred upon them power to tax in certain cases, but having failed to say how that power should be exercised, it was perfectly competent for the Legislature to prescribe the manner of its exercise; and when the mode and manner of exercising it had been pointed out by statute, the board were bound by the law, and must follow it. *Arrighi* v. *Board of Supervisors*, 54 Miss. 670. We have two events, then, in which the action of Boards of Supervisors in the levying of taxes will be void, viz.: First, where they exceed the powers granted by the law and by the Constitution; second, where they neglect to conform their action in the exercise of these powers to the expressed will of the Legislature as found in the statute-books of the State.

I. The board, in the levy before the court, have exceeded their powers by levying twenty-five mills.

II. They have exceeded their power, in that they have levied a tax to pay certain void warrants.

1. Boards of Supervisors are restricted by law in the levies for the current year, for all purposes, to fifteen mills on the dollar, inclusive of the State tax. Laws 1880, p. 87. That the Legislature has this power there can be no question. See *Board of Supervisors of Warren County* v. *Klein*, 51 Miss. 813. The board in the case before the court have levied twenty-five mills — ten mills in excess of the restriction.

But the excess is attempted to be justified under prior acts of the Legislature authorizing the county to bond its outstanding indebtedness, passed at different times. It cannot be so justified, for the reason that that construction of those acts will bring them into a hopeless conflict with the law just cited. If they can levy taxes under those acts *in addition* to those they may levy under the law of 1880, just cited, then they have a case in which they can exceed fifteen mills. The proviso to the first section of that law is that, " to *meet any outstanding indebtedness*, the tax to be levied may exceed twelve and a half mills, but in *no case* shall the total tax exceed $15 on each thousand dollars' worth of property." If the construction contended for by defendant is to be given to the acts which he cites, we have a conflict. Sect. 3 of the act of March 6, 1880, above cited, repeals all acts and parts of acts in conflict with this act.

But there is no conflict. The Legislature has not undertaken to repeal those laws, nor to cripple the ability of the county to provide for those debts. The legislative intent clearly is that all outstanding indebtedness of the county and its current expenses shall be provided for within the limitation of fifteen mills. We think it clear, also, that the limitation was intended to include all taxes for bridges, jails, etc., as provided in the Constitution ; but, to prevent any doubt on this point, we tendered three mills additional for these objects. 52 Miss. 127. It was perfectly legitimate for the Legislature to pass the act of 1880, and it will stand the test of judicial

sanction, as it does not impair the ability of the county to provide for its bonded indebtedness. The Board of Supervisors must provide for the bonded indebtedness and current expenses within the limitation of fifteen mills. We therefore conclude that the levy of twenty-five mills, exclusive of the State tax, is excessive at least seven, if not ten mills.

2. The levy was made in part to pay void warrants, and we have the right to show this fact. *Board of Supervisors* v. *Klein*, 51 Miss. 813 ; 54 Miss. 673. (1.) The warrants issued to individual members of the Board of Supervisors for " extra days' services " are void. They are only allowed for attend-, ance on regular meetings, and not for attendance on special meetings, except for mileage. Code 1871, sect. 1358. (2.) The warrants issued for work on public roads are void. The Board of Supervisors has no power to work roads by taxation. The Code provides a different mode for working public roads, and the statute is imperative. (3.) The warrants for roads and bridges are void, because the board did not conform to the law in letting out the contracts upon which they were issued.

They did not let out the contracts in open session of the board. The contracts were let out by individual members of the board in vacation. Every contract so made, whether for a bridge or for a road, is void ; every allowance made upon that contract is void ; every warrant issued upon such allowance is void. Rev. Code 1871, sect. 1394 ; *Arrighi* v. *Board of Supervisors*, 54 Miss. 670. Here are three classes of warrants clearly void for the reasons given, but they and a great many others *issued during the current year* are void for another reason, viz. : In not a single instance, when the allowance was made upon which the warrant was issued, were the votes of the individual members of the board recorded for and against the allowance, nor was the law under which the allowance was made, cited and entered upon the minutes of said board. See Laws 1877, p. 16.

Here, then, we have four classes of warrants outstanding

against the county that are absolutely void, and we have a levy made specifically to pay those void warrants. Has the board the *power* to make such a levy? And isn't the levy, in so far as it has been made to pay void warrants, void itself? The boards have the power to levy taxes to meet the necessary demands of their respective counties; this is given them by statute. They may lawfully levy a tax to provide for the current expenses of the county; they may lawfully levy a tax to satisfy any legal outstanding *indebtedness* against the county. Indeed, the court will require them to exhaust the taxing power for the purpose last named, inclusive of the powers conferred by the Constitution. *Board of Supervisors* v. *Klein*, 51 Miss. 813. But that portion of the levy made to pay void warrants is itself void for want of power in the board to make it.

Now, having established an excessive levy and a levy to pay void warrants, we claim that the levy to that extent should be enjoined. 52 Miss. 834. And, as a sale of property for taxes, a part of which is illegal, is void, it would seem proper that the whole tax in such case should be enjoined. *Gamble* v. *Witty*, 55 Miss. 27.

*Warren Cowan* and *H. C. McCabe*, counsel for the appellee, also made oral arguments.

GEORGE, J., delivered the opinion of the court.

The appellee is a tax-payer in the County of Warren, and he filed this bill in the Chancery Court seeking an injunction against the collection of all the county levies of that county for the present year, or, if that could not be done, then for an injunction against the collection of more than fifteen mills of such levies on each dollar of the assessed valuation of his property. He tendered eighteen mills on the dollar (three of which were for the State tax), and an injunction was granted against the collection of the excess. The various county levies amounted to twenty-two mills, and with the State tax to twenty-five mills, or two and one-half per cent on the val-

uation of the property of the county. The appellant, who was sheriff and tax-collector, was made a party defendant. He answered a part of the bill and demurred to a part, and on this answer and demurrer made a motion to dissolve the injunction, which being disallowed, he appeals to this court; and there is also a cross-appeal by the complainant, involving the action of the court below in some particulars not necessary now to be set out. Various grounds are presented and insisted on for the injunction, which we will now proceed to consider.

It is first insisted that the whole county levy is void, because there was no valid order of the Board of Supervisors imposing it. The facts on which this objection is based are as follow: The board met on September 9, 1880, and agreed to the levy, but adjourned before the order making it was entered on the minutes. After their adjournment the clerk entered on the minutes the order as it had been agreed to by the board, and at the next succeeding meeting of the board, — to wit, on the first Monday in the ensuing October, — these minutes were read over in the presence of the board, and approved by them and signed by the president.

It is unnecessary to express any opinion as to the exact *status* of the minutes of the September term before they had thus been approved by the board and signed by the president at the succeeding meeting. We entertain no doubt that the action taken at the October term made them valid from that time. The statute (Code 1871, sect. 1361) does not require that the president of the board shall sign the minutes before adjournment. This would be the regular and proper way to authenticate them; but the omission to do this may be remedied by an approval of them by the board at its next succeeding term and a signing by the president in its presence. Moreover, this approval and signing at the next meeting would have the effect to make the order valid, as of that term, if the order be such as the board could make at that term. Under sect. 2154 of the Code of 1880 (which section was in

force at the time), in case the Board of Supervisors fail to make the county levies at the time fixed by law, a special meeting may be called, as early as practicable, for the purpose of making the levies. We do not understand that this section requires such levies to be made only at a special meeting, but that such meeting is allowed for the purpose of securing a speedy compliance with the duty to make them. Should no such meeting be called, it is clear that it would be the duty of the board to make the levies at the next regular meeting. The object of this provision for a special term was to secure a prompt remedy for a serious neglect of duty by the board ; and this object would be subserved by making the levies at the first meeting, whether regular or special, which might be held after the omission to levy at the prescribed time.

It is next insisted that the injunction is justified because of the allegation in the bill, not denied by the answer, that the warrants for the payment of which certain of the levies were made are illegal and void. The bill charges that these warrants were in great part illegal, because the allowances on which they were issued were not made in accordance with the provisions of sect. 5 of "An act in relation to county finances," approved February 1, 1877 (Sess. Laws, p. 16), requiring the yeas and nays to be recorded on every allowance made by the board, and also the citation in the order of allowance of the particular statute under which it is made. By that statute the clerk is prohibited from issuing warrants on allowances made in disregard of these provisions. Warrants issued in violation of this statute are, without doubt, illegal and void, and they would constitute no proper voucher in the hands of the county treasurer if he should pay them, especially if he had notice of the failure to comply with the law. But we do not think the objection is available in this proceeding. It is the duty of the board to levy, within the limits prescribed by law, taxes sufficient to pay valid debts against the county ; and the claims on which these warrants were based may have been valid

debts, notwithstanding an invalid allowance of them by the Board of Supervisors. The allowance does not create the debt, but is only a recognition of it. An invalid recognition, though insufficient to authorize its payment, cannot invalidate a rightful demand. Other valid reasons against this claim of the appellee are stated in a subsequent part of this opinion.

It is also alleged in the bill that the debts on which these warrants are based are, in great part, illegal and void. Some of them are alleged to have been created by contracts entered into by the board for the making of the public roads of the county ; some by contracts for the building of bridges, made by individual members' of the board in vacation, and others for " extra services " by members of the board in letting out said contracts and in examining bridges and public roads. It is true there is no authority in the Board of Supervisors to build public roads with the revenues of the county. That work is provided for under the statute by the labor of persons liable to road-duty. Unless there be some local statute applicable to Warren County authorizing them, all such expenditures are unwarranted. The allowance for " extra services " made by the board to its members is also unwarranted. The salary of the members of the Board of Supervisors is fixed by statute. The board has no power to make any additional allowance, even for such services as they are not required by law to perform. They, like Boards of Mayor and Aldermen, are trustees charged with the duty of preserving and protecting the rights of the people over whom they have jurisdiction ; and it is not competent for such bodies, under well-settled rules, to claim for themselves, as against the people, any compensation not fixed by statute or plainly authorized by it. Any other rule would put it in the power of such officers to vote themselves largesses out of the corporate treasury at their discretion. The debt attempted to be created by the letting out of contracts for the building of bridges, by individual members of the board in vacation, are also invalid, as was settled in *Board of Supervisors* v. *Arrighi*, 54 Miss. 668. In

that case it was said : " It is well settled that contracts made by the officers of municipal or *quasi*-municipal corporations in violation of law impose no liability upon the body-politic, and that no subsequent ratification by such officers of the void contract can impart to it validity." The county boards, even as to matters confided to them by the Constitution, must act in accordance with law.

But, notwithstanding the invalidity of these debts, the injunction cannot be maintained on that ground. In the first place, the bill does not specify the debts or warrants claimed to be illegal. The allegation on this subject is that they are in great part void and illegal, on the ground before alluded to. This is too vague and uncertain to base judicial action on. Moreover, the holders of these warrants were not before the court; the tax-collector was the only party defendant. It would be improper to enjoin the raising of a fund out of which these holders might be paid, on the allegation of a fact which might be successfully denied, without giving them an opportunity of defence. Besides, there is a statute which fixes a limit beyond which the Board of Supervisors may not go in levying county taxes. And in cases where this restraint is operative, the board ought not, whilst acting within the prescribed limit, to be interfered with upon a mere allegation of excess in the levy, on account of alleged invalidity of claims to pay which the levies are made. This allegation might, upon investigation, be ascertained to be unfounded ; and that, too, at a time when it would be too late to collect the taxes for that year, whereby the greatest confusion would arise in the administration of county finances. Within the limit fixed by law the board must have a large, if not an absolute discretion. This rule does not leave the tax-payer without remedy to prevent the payment of illegal claims or void allowances out of the county treasury. He may enjoin the county treasurer from paying such claims, and the alleged creditor may intervene and set up his right ; or, in case he is known to the complainant in an injunction bill, he may be made a party de-

fendant. And in cases where the allowance is illegal on the face of the minutes of the board, — as for a non-compliance with the statute, which requires the recording of the yeas and nays and the citation of the statute under which the allowance was made, — he may notify the county treasurer of such illegality, who would then, on this actual notice, if not obliged to take such notice himself, be bound to withhold payment.

The position that the special levies under the local acts of 1871 and 1878, which authorized the Board of Supervisors to issue bonds, and required them to make a levy of a special tax to meet them, are restricted by the act of 1880, is untenable. The local acts on their face confer a power to levy the special tax in addition to, and outside of, the levies limited by law. Acts of that character, having only a local operation, are not presumed to be within the general words of repeal in a general statute passed for the regulation of the general affairs throughout the State. Besides, these special taxes were intended as a security for the bonds authorized by these acts to be issued, and the regular collection of them by the county was a part of the obligation of the contract contained in the bonds. The case is different with respect to the special tax authorized by sect. 4 of the act of 1873 (Sess. Laws, pp. 321, 322); for this special levy is expressly restricted to the limits prescribed by the general laws of the State in relation to the county levies. The tax of one and one-half mills authorized by sect. 2 of this last-named act is a tax only on a part of Warren County,— a school district,— and is not within the limits prescribed by the act of 1880, which refers to county levies, and not to impositions to pay a debt due by any district in the county.

The supervisors actually made levies to the amount of twenty-two mills. They had the power, under the general law, to levy taxes to the amount of twelve mills. Under the local act of 1871 they could levy the tax of one-half mill contained in their order, and under the local act of 1878 could levy the tax of four mills. They had also authority to levy one

and one-half mills under sect. 2 of the act of 1873, — in all eighteen mills, — leaving out of consideration the right to levy special taxes under sect. 16, Art. XII., of the Constitution. The chancellor enjoined all over fifteen mills, and his order was, therefore, certainly erroneous in enjoining three mills. But it is claimed by the appellant that, as five of the twenty-five mills were for bridge taxes, the whole levy should be sustained, and that the injunction should have been wholly dissolved. This raises the question whether the restriction in this act in relation to the public revenue, approved March 6, 1880, can be constitutionally applied to special levies for bridge taxes.

That the Legislature intended to embrace these levies within the restriction seems very clear from the language of the act, which declares that " Boards of Supervisors are hereby prohibited from levying taxes which, added to the State tax, will exceed twelve dollars and fifty cents on each thousand dollars of taxable property ; *provided*, that, to meet any outstanding indebtedness, the amount herein provided may exceed, but in no case shall the total tax exceed, fifteen dollars on each thousand dollars' worth of property." The statute, then, contains two further provisos — one allowing the Boards of Supervisors in nine named counties to levy taxes which, including the amount of the State tax, shall amount to twenty-one dollars on the thousand ; and the other, excluding from the operation of the restriction taxes levied to pay bonds issued in aid of the Natchez and Jackson Railroad Company. This language is plain and unmistakable.

It is urged on behalf of the appellant that this provision is unconstitutional, in assuming to limit the power of the Board of Supervisors to determine upon the sufficiency of the amount to be raised for the erection and repair of court-houses, jails, and bridges, and other necessary conveniences for the people of the county. It is insisted that sect. 16 of Art. XII. of the Constitution confers on the Board of Supervisors the unrestricted right to raise by special tax whatever sum, however

large, they may deem necessary for these purposes, and that the general supremacy and controlling power of the Legislature, acknowledged to exist as to all other matters of county taxation, is excluded by the terms of this section, which is as follows : —

" No county shall be denied the right to raise, by special tax, money sufficient to pay for the building and repairing of court-houses, jails, bridges, and other necessary conveniences for the people of the county, and money thus collected shall never be appropriated for any other purpose; *provided*, the tax thus levied shall be a certain per cent on all tax levied by the State."

We cannot give our assent to this construction ; and, as there are two cases in this court from which we are compelled to dissent, it is proper that we state the grounds upon which we rest our decision. It is a cardinal rule of construction of constitutions and statutes to ascertain the intention of the framers of the instrument; and this intention will be that which the natural signification of the words employed, taken in their ordinary sense, indicates, if this sense be plain and involve no absurdity and no contradiction in different parts of the constitution or statute. Tested by this rule, the section under consideration is a direction to the Legislature not to deny to the counties the right to levy by special tax a sufficient amount for the purposes mentioned in it. The word " deny " means to withhold — to refuse to grant. (See Webster's Dictionary.) There can be no withholding except by a power which may retain or keep back, nor a refusal to grant except where the thing refused may be granted. Hence the language employed refers to a right which is thereafter to be granted, and does not of its own force operate as a vesting of power. The language is, that " no county shall be denied the right to raise," etc., which is exactly equivalent to the phrase, " the right to raise, etc., shall not be withheld from, or refused to be granted to, any county." A man cannot properly be said to withhold that which he does not possess, nor to refuse a grant

of that which already belongs to the grantee. The words used, taken in their ordinary and popular signification, imply a direction to a department having the power to grant and to withhold, and are a limitation upon this power. They do not imply a destruction of all power over the subject in this department, which, but for this section, would possess it. If that had been the intent, the appropriate language would have been to prohibit all "interference" with the right to levy. The section must, therefore, be considered as directed to the Legislature, commanding that body not to withhold from the counties the right to levy a sufficient amount for the purposes mentioned. The Legislature may regulate and restrict this right, if only a sufficiency of taxation for the purposes mentioned be granted. The Legislature must necessarily be the judge of what is sufficient. The right to tax is to be granted by the Legislature. That body is commanded not to refuse to make the grant. The grant is to be of a "sufficient" amount; and unquestionably the granting power must judge of the sufficiency, unless some other tribunal is invested by the Constitution with a supervisory power over the Legislature on the subject, and possesses the right to fix absolutely, in its discretion, what sum shall be granted by the Legislature. This power is not claimed to be vested in any tribunal except the Board of Supervisors. If vested in the board, it must be by this clause, or some other part of the Constitution. It is not among the powers granted to them by sect. 20, Art. VI., which enumerates the powers and jurisdiction vested in the board; nor does any other clause confer it. It is not granted to the supervisors by the clause in question, for that body is not mentioned in it, though especially named in every other clause in the Constitution, including sect. 29 of this same article, in which a power is granted to them. Moreover, if the board are to judge of the sufficiency of the amount, then they have, in opposition to the plain words of the Constitution, the absolute power, without any grant from the Legislature, to levy a special tax for the purposes named, to any extent they may

deem sufficient. If this had been the intent of the framers of the Constitution, they have employed language singularly inappropriate to express it. The rule that requires us to take words used in the Constitution in their ordinary and popular sense, presumes that the framers of the Constitution knew how to express their ideas in appropriate language. In all other parts of this instrument where power is granted, the grant is made in plain and proper language. Power is "vested," as in Art. IV., sect. 1; Art. V., sect. 1, and Art. VI., sect. 1; or, as it is expressed in sect. 29, Art. XII., "the county boards shall have power to," etc. To arrive at the construction which we have rejected, we must disregard the plain meaning of the words, taken in their ordinary signification, and we must also suppose that the convention, in this clause alone, rejected the ordinary constitutional language employed by themselves in making grants of power, and resorted to a circumlocution which of itself negatives the idea intended to be conveyed. We are not authorized to indulge in such a supposition. We must follow the language as used, and give it its proper signification.

There is a plain difference between the denial of a power and a grant regulative of its exercise. A prohibition against the denial of a right cannot fairly be construed into an exclusion of an otherwise acknowledged power of control and supervision. A right may be regulated and limited, even impaired, without being absolutely denied.

The correctness of this view is made clear by several other considerations, some of which we will notice. From the earliest period, in England and in this country, the taxing power has been lodged in the Legislature, and in no other department of the government. This power was asserted and claimed for the Parliament, both in the Petition of Right assented to by Charles I. and by the Bill of Rights adopted in the first year of William and Mary. In the early constitutions of the American States it was asserted as a fundamental principle of free government. It is expressed in the Con-

stitution of Maryland, adopted in 1776, in the following words: "No aid, charge, tax-fee, or fees ought to be set, rated, or levied, under any pretence whatever, without the consent of the Legislature." And in the Constitution of Massachusetts, adopted in 1780, this power for the Legislature is asserted thus: "No subsidy, tax-charge, impost, or duties ought to be established, fixed, or levied, under any pretence whatever, without the consent of the people or their representatives in the Legislature." From the earliest times, also, the Legislature was accustomed to grant the power to counties, cities, and towns to levy taxes on themselves for local purposes. But this power was always a grant by the Legislature, and its exercise, both in the manner and as to the amount, regulated and fixed by law. The Legislature was the fountain of all power of taxation. The Supreme Court of North Carolina, in *Caldwell* v. *Justices of Burk*, 4 Jones Eq. 222–224, in deciding upon the constitutionality of a grant by the Legislature of a power to a county to levy a tax in aid of a railroad, speaking through Judge Ruffin, said: "From time immemorial, the counties, parishes, towns, and other territorial subdivisions of the country have been *allowed* in England, and indeed *required*, to levy rates on themselves for local purposes. * * * From the foundation of our government, colonial and republican, the sums necessary for local purposes have been raised by the people or authorities at home. * * * When, therefore, the Constitution vests the legislative power in the General Assembly, it must be understood to mean that power as it has been exercised by our forefathers before and after their migration to this continent." And because the power to grant and to refuse, and to regulate and control the right of local taxation was a legislative power — embraced in the grant of legislative power — in the Constitution, the court upheld the delegation by the Legislature of the taxing power to the counties in that case. This power has been uniformly exercised by the Legislature here, both under the Territorial government and since the organization of the State. In

*Daily* v. *Swope*, 47 Miss. 367–379, this court said: "The county or city has no inherent right of taxation. Both these political organisms exert the taxing power by delegation from the State. The appointed agencies for the county, such as the Board of Supervisors, * * * *tax by virtue of authority conferred by the Legislature.*" The American and Anglo-Saxon theory of self-government is, that political subdivisions of the State may be allowed, and even compelled, to lay taxes on themselves for local purposes, but always in subordination to the regulations and restrictions imposed by the Legislature. It is not questioned that the Board of Supervisors can levy no tax outside of sect. 16, Art. XII., of the Constitution without a grant of power by the Legislature. It cannot be denied that the right to make the grant to the board of power to tax, and to restrict and limit it, is a clear legislative power vested in the Legislature by sect. 1, Art. IV., of the Constitution. It is equally clear that sect. 20, Art. VI., which establishes the Boards of Supervisors, and fixes and defines their powers and jurisdiction, does not confer as an original power on these boards the right to levy taxes without the consent of the Legislature. The convention adopted these sections, and all other parts of the Constitution, with the knowledge that the power of the Legislature to grant or refuse to grant, to regulate and limit the power of local taxation, was supreme. With this knowledge they framed the section in controversy. It is a just presumption that if they intended by this section to take away this unquestioned power of the Legislature, previously granted to it in the same Constitution, and to vest in the Board of Supervisors an original and unrestricted power of taxation, the convention would have done so in clear and certain language, and not left it to argument and inference. The convention showed, when it desired to vest a new power in the Board of Supervisors, that it knew how to do it by appropriate language. Thus, in sect. 29 of the same article of the Constitution in which the clause in controversy is found, it is provided that "the

county boards shall have power to provide," etc. It is fair to assume that a revolution in so important a matter in the constitutional jurisprudence of this and of every other State in in the Union was not intended to be effected by the language used, especially since the language is entirely consistent with the previously settled rule on the subject. There are numer ous instances in the Constitution of provisions like this, addressed solely to the conscience and judgment of the Legislature, and which can have no force or operation except such as the Legislature may see proper to give them. Thus, in Art. IV. we find the following: (Sect. 33) "The Legislature shall provide for an enumeration of inhabitants;" (sect. 37) "the Legislature shall provide for the organization of new counties;" (sect. 39) "the Legislature shall provide for determining contested elections;" and in Art. VIII., sect. 1, "it shall be the duty of the Legislature to encourage by all suitable means the promotion of intellectual and moral * * * improvement, * * * and shall establish schools of a higher grade" than common schools. Art. IX., sect. 3: "it shall be the duty of the Legislature to make such laws as shall be necessary to create an effective militia." And in the same article of which this section is a part. similar provisions are found. Thus, in sect. 2: "The Legislature shall pass laws to exclude from office and suffrage" certain persons; (sect. 4) "the Legislature shall provide by law for the indictment and trial of persons" in counties other than those in which the offences were committed; (sect. 10) "it shall be the duty of the Legislature to regulate by law" deductions to be made from salaries of public officers; (sect. 28) "the Legislature shall provide houses of refuge and reformation for juvenile offenders;" (sect. 27) "it shall be the duty of the Legislature to provide by law" for the insane, deaf and dumb, etc. And in reference to the taxing power, — the raising of revenue for free schools, — declared by the Constitution to be necessary to the stability of the government, is a similar provision, addressed solely to the con-

science and judgment of the Legislature. It reads thus (Art. X., sect. 10): "The Legislature shall, from time to time, as may be necessary, provide for the levy and collection of such taxes as may be *required* [exactly the same as may be *sufficient*] to properly support the system of free schools herein adopted." It is thus seen that the construction we adopt is in harmony with the provisions of the Constitution, and consistent with a well-defined purpose in the framers of that instrument to regulate the exercise of admitted legislative power by directions given to that body binding alone on its conscience. Every one of the provisions above quoted has no other force than the Legislature may see proper to give it. Provisions of a similar character are found in the Constitutions of all the States of the American Union. We quote only two, they being exactly analogous to the section under consideration as being attempts to control the legislative power over taxation. The Constitution of Texas of 1876 (Art. V., sect. 41) provides that "the Legislature shall not have the right to levy taxes or impose burdens on the people, except to raise revenue sufficient for the economical administration of the government," etc. A similar provision is found in the Constitution of Virginia. In these constitutions, as in the section under consideration, there is no revisory power to decide upon the sufficiency of the taxation. That must be determined, under the obligations of their oaths, by the members of the Legislature.

It is germane to this branch of the argument to state that excessive taxation and reckless expenditures by county and other local boards are recognized evils of the times, and that in every recent American constitution, provisions are made either directly restricting such taxation or requiring the Legislature to do so. In only one instance have we found a provision allowing local taxation beyond the control of the Legislature, and that is in the Constitution of Nevada, securing to cities in that rainless land the power to procure necessary water. So, in order to arrive at the construction

rejected by us, we must not only disregard the plain meaning of the language employed and the constitutional history of the State, but we must run counter to the general current of constitutional provisions on this subject.

The construction sanctioned by this court in the two cases before alluded to, encounters this further difficulty: If the Board of Supervisors have the unrestricted right to raise what sum they may deem sufficient for the purposes mentioned in the section, they have also the right to determine for themselves what " other necessary conveniences for the people of the county " they will supply out of this unlimited fund. There is no restriction as to the objects to which the tax may be applied, except only the discretion of the board, and their judgment that they are necessary conveniences for the people. A power so ample may well be deemed alarming. Such a sway over private property has never been granted to any body of magistracy in a free government. The existence of this power would be absolutely inconsistent with the institution of private property. The advocates of this construction of the Constitution shrink from claiming so enormous and dangerous a power for the Board of Supervisors. In the recent Code of this State, by sect. 2150, the " necessary conveniences " are restricted to county buildings other than jails and court-houses. This provision would be unconstitutional if we are in error as to the true meaning of the section in controversy. There is no reason arising from the language used, or from other parts of the Constitution, which would deprive the Legislature of its power to limit and fix the amount of the special tax, and yet would allow it to interfere to limit the " necessary conveniences " to which the tax may be applied. The words " necessary conveniences " are embraced in the same sentence with " court-houses, bridges, and jails," and separated from them only by the like punctuation-mark which separates them from each other; and there is no rule of grammar or construction which authorizes us to say there is less control in the board over one than the other. It is

also fatal to this view that it assumes that the right of the
county boards to levy unlimited taxes for the purposes men-
tioned, independent of any control by the Legislature, was
deemed so important by the convention as to demand a pro-
vision to that effect; yet the very clause intended to secure
this essential end accomplishes only half of this purpose, and
admits legislative interference as to the other half.   The con-
clusion is irresistible that if the Legislature may limit and
control the power of the board to tax as to " necessary con-
veniences," it may do the same as to court-houses, bridges,
and jails.

It is also a rule of construction of constitutions and statutes
that the instrument should be made, if possible, harmonious
and consistent with itself.   Its framers are presumed to have
a definite and consistent policy, which is a key to all the pro-
visions on the same subject-matter, and that which is clearly
within the same mischief must be interpreted as intended to be
within the same remedy.   It is not to be presumed that pro-
visions were inserted at random, to subserve some detached or
isolated purpose.   In constitutions, especially, we are to look
for a careful and well-digested plan of government, under which
there may be a regular, well-ordered, and harmonious adminis-
tration.   To justify the construction contended for by the appel-
lant, we must suppose that the convention was moved by a
mischief felt as then existing as to the unwillingness of the
Legislature to grant sufficient taxing-power for court-houses
and jails and the means of intercourse and commerce among
the people, and that it intended to remedy this mischief by
securing an absolute control over these matters in the Boards
of Supervisors.   It is impossible to conceive any other foun-
dation for this section, if to be construed as contended for.
But, as to the means of intercourse and commerce, provision
is made only for a part, and that, too, not a very essential part,
of this important subject.   As to roads and ferries, — the
first an essential, and the second an important part of the
means of intercourse, — the power of the Legislature to limit

and restrict the Board of Supervisors is unquestioned. In that part of this opinion in which all the judges concur, it is held that the Board of Supervisors cannot expend a dollar for building or repairing roads without the consent of the Legislature; and the same principle was announced in respect to ferries, in *Board of Supervisors* v. *McFadden*, 57 Miss. 618. Under that construction, the Constitution means that the Legislature may not be trusted with power to grant the means to build a bridge, but may be as to the roads over which access to the bridge is alone possible, and without which the bridge would be utterly valueless. The Board of Supervisors cannot spend a dollar to repair a road or a ferry, to make a causeway, or drain a pond over which a road is located, but may, without limitation or restriction, build a bridge wherever they may deem proper. Thus it is seen that this great public policy supposed to be inaugurated by this section, so far as the means of intercourse and travel are concerned, is found to expend itself in the securing of the building of inaccessible bridges. A construction which involves such a conclusion should not be adopted.

It is well settled that courts ought not, except in cases admitting of no reasonable doubt, to take upon themselves to say that the Legislature has exceeded its powers and violated the Constitution, especially where the legislative construction has been given to the Constitution by those who framed its provisions, and contemporaneous with its adoption. Sedgw. on Stat. & Const. Law, 409, and cases there cited. This rule has been fully recognized in this State. *Campbell* v. *Union Bank*, 6 How. 628; *Newsom* v. *Cock*, 44 Miss. 352.

In the Code of 1871, adopted contemporaneously with the Constitution, the power of the Legislature to restrict and limit the power of Boards of Supervisors to levy the special tax named in the section of the Constitution under consideration was asserted, and a limit imposed. See Code 1871, sect. 1369. The same restriction is imposed by the Acts of 1872, p. 19, sect. 12; and by sect. 1, chap. 27, p. 52, of the

Acts of 1875 ; and by sect. 108, chap. 5, p. 82, of the Acts of 1878 ; and by sect. 1, chap. 8, p. 87, of the Acts of 1880. This uniform construction put on this section by the Legislature ought not, under well-settled rules, to be disregarded by the courts, except in a very clear case. Our whole history under the Constitution of 1869 has been, under successive statutes, continuously in force and five times enacted, putting the construction we adopt on this clause of the Constitution. It is not to be presumed that the Legislature did not understand or did not observe the Constitution. These enactments must prevail, unless they can be shown to be clearly wrong ; and especially is this true when the question involved is purely administrative and political, not trenching upon private rights.

We have deemed it our duty at some length to state the reasons of our judgment, because there are two decisions of this court to the contrary. *Board of Supervisors* v. *Klein*, 51 Miss. 807 ; *Gamble* v. *Witty*, 55 Miss. 26. We depart from these decisions with reluctance, both on account of the weight due to the opinions of the learned judges who concurred in them, and also on account of the appearance of vacillation in the opinions of the court. But these decisions have not been acquiesced in by the Legislature, who, on two occasions since they were rendered, reasserted the power we concede to them, and thus challenged a reëxamination of the grounds on which these cases are based. The Legislatures thus acting contained some of the ablest lawyers in the State. In the Code of 1880, sect. 2150, is also a clear recognition of the views we have announced. That section contains a grant by the Legislature of a power to levy this special tax, which was improper if the board already possessed it ; and it also limits the power of the board "as to necessary conveniences" by limiting them to "other county buildings." If it be proper to speculate as to the sense in which the people adopted this section of the Constitution, the best evidence is that they, through their representatives, have uniformly construed it as we do. The first opinion delivered in *Board of Super-*

*visors* v. *Klein* (never reported) proceeded on the idea that the statute restricting the power of the board was constitutional, and it was only after the case came here a second time that a contrary conclusion was reached. Thus supported, we feel that we are fully justified in the conclusion we have reached.

We are fully impressed with the force of the doctrine *stare decisis* in all cases in which it is proper to apply it. But we do not think we ought to surrender our convictions — fortified, as they are, by the repeated and deliberate enactments of the political department of the government — to the authority of these cases, since no property rights, but only the proper administration of the government, are involved. In *Lombard* v. *Lombard*, 57 Miss. 177, it was said that, " where the former decision refused a right reserved to individuals as against the power of the government, or where it impaired the powers of the people or their representatives to prevent maladministration, or sanctioned an alienation of legislative power conferred for the public good, little hesitation should be felt in departing from it, if it be incorrect." The question here is of the character thus described. The former decision destroys a most wholesome power, always theretofore recognized as existing in the Legislature, to protect the people from corrupt and wasteful administration in public affairs. The history of the times and the experience of every State in the Union teach us that the safeguards which these decisions have overthrown are essential to the public welfare.

Decree reversed and cause remanded, with instructions to modify the injunction according to this opinion.

CHALMERS, C. J., concurring.

The sixteenth section of Art. XII. of the State Constitution is in these words : " No county shall be denied the right to raise, by special tax, money sufficient to pay for the building and repairing of court-houses, jails, bridges, and other necessary conveniences for the people of the county, and money thus collected shall never be appropriated for any other pur-

pose; *provided*, the tax thus levied shall be a certain per cent on all taxes levied by the State."

We construed this section in *Board of Supervisors* v. *Klein*, 51 Miss. 807, and in *Gamble* v. *Witty*, 55 Miss. 26, as conferring upon the several Boards of Supervisors the right, unrestricted by legislative control, of levying such taxes as they thought fit for the purposes indicated in the section. This construction was adopted without discussion by counsel or any close analysis by the court. If it was wrong, it should be corrected; since, to a construction of the Constitution relating solely to a question of public administration, and which cannot involve rights of private property acquired upon the faith of the decision, the doctrine of *stare decisis* can have no proper application.

In the wisdom of that doctrine I am a firm believer, but it loses much if not all its force in a case like this. I incline to the opinion that the former construction was erroneous, though the matter is not free from doubt.

All power of taxation with us resides in the Legislature, and exists nowhere else save by legislative grant, unless this clause of the Constitution confers an independent power of levying taxes upon the Boards of County Supervisors. The section is either a negation of power to the Legislature or a grant of power to these boards. Let us scrutinize it in both aspects. If it is a negation of power to the Legislature, it is not a complete negation. That body, which would, but for this section, have the undoubted right to deny all power of taxation to the boards and to levy county taxes itself, leaving to the boards the control over the expenditure of such taxes, is not by this section prohibited from denying to them the right to levy excessive taxes, but only from denying the right to levy "sufficient taxes." If it was intended to deny them any control whatever over the subject, the word "sufficient" should be omitted, and the clause should read: "No county shall be denied the right to raise, by special tax, money to pay for," etc. But, the Legislature not being prohibited from de-

nying to the counties the right to levy taxes which are more than sufficient for the purposes indicated, there must reside somewhere the right to determine what is sufficient. Where does this power reside? Is it in the courts? I think not; because it must ever be essentially an administrative or legislative question, in the settlement of which the courts would involve themselves in endless difficulties. Is it in the Boards of Supervisors? I think not; because, if so, the insertion of the word "sufficient" accomplishes no result whatever, the meaning of the sentence, under this view, being exactly the same with that word omitted. I conclude, therefore, that the power of determination resides in the General Assembly of the people — that universal depository of the taxing power, that independent department of the government which absorbs and swallows up all legitimate governmental functions which cannot be specifically located elsewhere.

The same result follows if we regard the section as a grant of power to the Boards of Supervisors. It is a grant of the right to levy, not unlimited taxes, but "sufficient" taxes; but if the boards are themselves the judges of the sufficiency of the taxes to be levied by themselves, the grant becomes unlimited, and the restrictive word "sufficient" is stricken out. This word in no event must be stricken out, because it is the key-note of the sentence; and when the body that is to determine when it has been violated is ascertained, the meaning of the provision is fixed. It does not advance the argument to say that these boards are granted the power to levy the taxes as their judgment dictates, and that it is a mere matter of computation whether the taxes levied are more than sufficient, because the question still remains, "Who is to be the computer?"

If the right of the boards to determine the sufficiency of the taxes is unlimited, their right to determine for what purposes they are to be raised must be equally so; since they may be appropriated either to court-houses, jails, and bridges, or to any "other necessary county conveniences," and these words must embrace everything that the boards, under one theory, or the Legislature, under the other, may see fit to indicate. It

seems a doctrine truly alarming to hold that the Boards of Supervisors can determine what is a county convenience, and then levy such taxes as they see fit for its construction, and that their powers in both respects are unlimited and illimitable. It is quite safe to say that no Constitution ever framed in America contains such a provision, unless ours does.

It is true that it seems to be an idle thing to say that the Legislature must not deny to the counties the right to raise such taxes as the Legislature thinks sufficient, but it is equally incongruous to grant to the Boards of Supervisors an unlimited power of taxation, provided they shall not levy more than they think sufficient. Compelled to choose one of the horns of this dilemma, I prefer the construction which gives the Legislature a supervisory control over the matter, because more in consonance with our past history and the general current of constitutional jurisprudence elsewhere, and more conducive to the public welfare. Whenever two theories of a constitutional provision seem equally admissible, it is the duty of this court to adopt that which is most in accordance with our historic methods and most promotive of the public interest. This is my construction of the clause. The Legislature, which alone possesses the power of taxation ordinarily, and grants a subordinate authority to such inferior bodies as. it pleases, is forbidden by this section to withhold from the counties the right of taxation for the purposes specified, to an amount sufficient to accomplish the ends ; leaving to the legislative wisdom, where so many other matters of importance are left, the determination of when that point is reached. If the Legislature prescribes no limit, the right of the county boards is unlimited. If it prescribes a limit it must be observed, unless it is a total prohibition of all taxes. It thus amounts to a qualified grant of power of taxation to the county boards, and a qualified prohibition to the Legislature.

CAMPBELL, J., dissenting.

I dissent from the interpretation of sect. 16 of Art. XII. of the Constitution sanctioned by a majority 'of the judges

of this court, and, not contenting myself with the announce-
ment of what I believe to be the proper interpretation of that
section made by this court in *Board of Supervisors* v. *Klein*,
51 Miss. 807, and *Gamble* v. *Witty*, 55 Miss. 26, now proceed
to state the reasons which conduct me to that conclusion.     I
do not appeal to *stare decisis*, sometimes  potent in  its influ-
ence.

The question is as to the meaning of the section — not what
we might wish it to be, but what it is.  The object to be
sought is the *intent* of the people in adopting it.   That in-
tent is to be found, if possible, in the words used.   Those
words are to be taken in their ordinary sense and com-
mon acceptation, and that meaning is to be given to them
which naturally suggests itself upon their perusal.   No mat-
ter as to the form of expression, whether the most apt or not,
if the purpose of the provision is manifest from the language
employed, effect must be given to it.   Subtilty and refinement
and astuteness are not admissible to explain away an expres-
sion of the sovereign will.   A sense suggested by reading a
provision of the Constitution which requires ingenious reason-
ing to explain it away ought not to be thus disposed of, be-
cause it cannot be supposed that such reasoning was applied
to it by those who adopted it.   The framers of the Consti-
tution and the people who adopted it must be understood to
have intended the words employed in that sense most likely
to arise from them on first reading them.

" Narrow and technical reasoning is misplaced when it is
brought to bear upon an instrument framed by the people
themselves, for themselves, and designed as a chart upon
which every man, learned and unlearned, may be able to trace
the leading principles of government." Cooley's Const.
Lim. 59.

" Constitutions are not designed for metaphysical or logical
subtilties, for niceties of expression, for critical propriety,
for elaborate shades of meaning, or for the exercise of philo-
sophical acuteness or judicial research.   They are instruments

of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them ; the people adopt them ; the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." Story on Const., sect. 451.

" But the most important rule in cases of this nature is that a constitution of government does not and cannot, from its nature, depend in any great degree upon mere verbal criticism or upon the import of single words. Such criticism may not be wholly without use ; it may sometimes illustrate or unfold the appropriate sense ; but unless it stands well with the context and subject-matter it must yield to the latter. While, then, we may resort to the meaning of single words to assist our inquiries, we should never forget that it is an instrument of government we are to construe, and, as has already been stated, that must be the truest exposition which best harmonizes with its design, its objects, and its general structure." Vattel's L. N., bk. 2, chap. 17, sects. 285, 286.

The suggestion is plausible, at least, that the meaning of sect. 16, Art. XII., twice adopted by this court, is its most obvious one. By sect. 20 of Art. VI. of the Constitution it is provided that " the qualified electors of each county shall elect five persons, by districts, for the term of two years, who shall constitute a Board of Supervisors for each county, a majority of whom may transact business, which body shall have full jurisdiction over roads, ferries, and bridges, and shall order all county elections to fill vacancies that may arise in the offices of their respective counties, and perform such other duties as shall be provided by law." Certain matters for their cognizance are specified by the Constitution, and it is left for the law-making power to provide by law such other duties as it may see proper to devolve on the Boards of Supervisors.

Among the " general provisions " in Art. XII. is : " Sect.

16. No county shall be denied the right to raise, by special tax, money sufficient to pay for the building and repairing of court-houses, jails, bridges, and other necessary conveniences for the people of the county ; and money thus collected shall never be appropriated for any other purpose ; *provided*, the tax thus levied shall be a certain per cent on all tax levied by the State.'' This is equivalent to saying '' every county shall have the right to raise,'' etc. It shall not be denied ; that is, the right shall not be withheld or refused, because it is the intent of the instrument that the right shall be possessed by every county, secure from denial by that body which, but for this limitation on its power, might deny it.

The specific provisions of sect. 16 are inconsistent with the assumption of a mere address to the Legislature, and indicate a purpose to exclude legislative intervention and to confer upon the counties the right to do in the way prescribed what is provided for. An analysis of the section will make this clear. '' No county shall be denied the right.'' The idea involved is that every county shall have the right, for it is placed beyond denial. It shall not be refused nor withheld. But for this limitation, the law-making power might refuse to counties this right. By legislative action it might be withheld. It shall not be. The county shall have it. No power shall deny it. '' To raise by special tax :'' A specification of the manner in which this right shall be exercised. '' Money sufficient :'' A limitation on the right thus secured to the county. '' Sufficient '' money : Not more than is required. '' To pay for the building and repairing of court-houses, jails, bridges, and other necessary conveniences for the people of the county :'' An enumeration of the objects for which the right may be exercised. '' And money thus collected shall never be appropriated for any other purpose :'' A provision against an abuse of the power conferred, lest, under cover of this right, money should be collected nominally to pay for the building and repairing of court-houses, jails, bridges, etc., and afterwards should be applied to other uses. ''*Provided,*

the tax thus levied shall be a certain per cent on all tax levied by the State :'' A specification of the subjects of the special tax, the right to levy which is secured to every county, under the limitations prescribed. '' Tax levied by the State'' suggests another tax levied, not by the State, but by the county.

Why these minute details — this specification of the right to raise money, the manner of doing it, the amount, the objects for which it may be raised, and the exclusion of the abuse of the right to raise money for the specified purposes, by prohibiting its appropriation for any other purpose? If the section is held to confer on the counties the right mentioned, these details for its exercise and to prevent its abuse are appropriate ; but if it is held to be merely admonitory to the Legislature, they seem out of place.

When the Constitution declares a right, and defines the circumstances under which and the manner in which it may be exercised, the specification is a prohibition against legislative infringement of the right, or change of the circumstances or the manner for the exercise of the right declared.

The fact that the section does not say that the Board of Supervisors shall not be denied, but uses the expression, '' No county shall be denied,'' does not alter the case. The thought embraced, rather than mere form of expression, is to be considered. The Constitution was made for a people accustomed to the exercise of the power of local taxation for the purposes named in the section under consideration, by a tribunal formerly existing in the several counties, by the name of Boards of Police. The Constitution was the successor of a former one, for the most part copied by the new one, and it found a body of statutes in force and continued them in operation. By the former Constitution each county had a Board of Police, consisting of five persons, elected by districts, with full jurisdiction over roads, highways, ferries, and bridges, and all other matters of county police, and with the duty to order all county elections to fill vacancies in all offices of the county. The new Constitution changed the name of the board, but

continued it under the name of the Board of Supervisors, prescribing its jurisdiction, as before possessed, omitting "highways," and instead of "all other matters of county police," substituted "such other duties as shall be provided by law."

This Constitution found in force this provision : "The Board of Police of any county may levy a special tax for the erection or repair of the court-house, jail, or other county buildings, and bridges, whether the same shall exceed the State tax or not, to be applied to no other purpose." Rev. Code 1857, p. 417, art. 22. And it is apparent that this suggested sect. 16, Art. XII., of the Constitution. This statute continued in force under the new Constitution, being applicable to the Board of Supervisors. It seems plain that the intention must have been to invest with the force of the fundamental law the right of the county, acting through its own tribunal charged with county matters, to raise money sufficient to pay for the things mentioned. It is manifest that the purpose was to give the right to the acting authority of the county. "Bridges" are a subject of the grant of jurisdiction to the Board of Supervisors, and court-houses and jails were subjects intrusted to them by law. It was known that building and repairing court-houses, jails, and bridges required money. These are local in their character. It was fit that they who were to bear the burden of maintaining them should have the right to determine their character and pay for what they chose to have.

I do not deny to the Legislature the right to regulate the exercise of the right conferred by sect. 16, Art. XII. The right to *regulate* and the right to *abridge* are different things. I admit the former and deny the latter. It is competent for the Legislature to make an estimate of the cost of the work, and an advertisement of the letting of the contract, and the making of the contract, and the completion of the contract, and other like things, a condition precedent to the collection of the special tax provided for.

Whatever may be a proper regulation for the exercise of the right secured to the counties, not amounting to an infringement of it, is lawful. Since the right is secured to the *county*, it may be that it is within the power of the Legislature to require a vote of the people of the county upon the question of the expenditures to be made for court-houses, jails, and bridges. I am not prepared to say what is the limit of legislative power in regulating the exercise of the right secured to the counties. I would deny it only at the point where regulation amounts to infringement, and that can be determined only in a given case when it may arise.

The fact that the constitutions of other States contain directions to the legislatures to restrict or limit local taxation by municipal organizations, and that with these examples before the framers of our Constitution they inserted the provision under consideration, strengthens the conviction that, instead of such direction to the Legislature as other constitutions contained, they purposed to secure to each county, beyond the right of legislative denial, the rights specifically conferred by sect. 16, Art. XII.

The fact that in the Constitution of 1832, to which this was a successor, there was no such provision in favor of counties, but the whole subject was left to the Legislature, and that this provision was made, shows that a change was intended, and the obvious design was to guard the rights of the counties in the matters specified; and that construction should prevail which will effectuate that design. To say that the conscience of the Legislature is addressed, is to fritter away the provision; but to consider the right as secured to the counties is to give efficacy to it. The expressed will of the sovereign is that the right should not be denied. To regard that will, a construction which will preclude its being thwarted should be adopted.

There is nothing in any of the words employed in the section which presents any difficulty in the way of the adoption of my view. The word "sufficient" does not suggest the

idea of legislative determination of the sum of money to be
raised.   It is a limitation of the right secured to the counties.
Authority is given to raise enough money — no more — for the
objects named.   What is sufficient (enough) is determinable
by what is necessary to pay for the things named.  That is to
be determined by computation.   The facts in each case fur-
nish the guide as to what is sufficient.   The Board of Police
had formerly caused court-houses, jails, and bridges to be
erected, and this power was continued in the same body, by its
new name of Board of Supervisors, by the new Constitution.
It was made with reference, as before stated, to the existing
order of things.   It had a practical view, and must be read
with reference to the state of society in which and for which
it was made.   By existing law when it was made, it was de-
clared that the Board of Police " may levy a special tax for
the erection or repair of the court-house, jail, or other
county buildings, and bridges, whether the same shall exceed
the State tax or not, to be applied to no other purpose."

This law was continued in force, and in substance was trans-
planted into the Constitution in the section under considera-
tion.   The words, " and other necessary conveniences for the
people of the county," are added to the objects specified to
embrace things of the same kind with those named, and
which are considered necessary for the public convenience.
Being for the people of the county, it seems harmonious with
the principle of local government as to local matters that they
who are immediately concerned in benefits and burdens should
be the judges of what are necessary conveniences to them.

The division of the State into counties, and the adminis-
tration of the affairs of each county by officers elected by the
qualified electors of such county, and *decentralization* by com-
mitting to local management everything except what pertains
to the State at large, is a favorite theory in American prac-
tice, and has characterized the government of this State, as
shown by its history contained in its several Constitutions and
laws.   This feature is preserved in the present Constitution,

and the right of each county to do certain things in a certain way, with restrictions on abuse of the right, is elevated from mere statutory creation — liable constantly to change — to the security of constitutional guaranty. If this be not the meaning of the section under review, its insertion was folly and its effect nugatory. There is danger of construing the Constitution by the varying circumstances of society, as determined by the condition of different counties with respect to their qualified electors, and the apprehension that may arise of the abuse of the right in some counties if it shall be held to be secured to them by the Constitution. It is wholly inadmissible to construe the Constitution by any such consideration. The division into counties and the provision for the local administration of the internal matters of each, without regard to differences of population as likely to produce good or bad administration, are all that can properly be looked to. The Constitution treats all counties alike. Each is to have the same tribunals, the same officers, and the same rights. The true office of interpretation is to look at the system, to discover the scheme as applied to all, and to give effect to it.

Experience shows that local matters can best be left to local control, and that a community immediately interested in benefits for which it is to pay may be safely intrusted with their procurement. That is the plan of government found in existence and continued by the present Constitution, with the added safeguards contained in sect. 16, Art. XII., which should be construed in harmony with the plan. What is called contemporaneous construction by legislative action is entitled to little weight in ascertaining the meaning of the Constitution. It has been but nine years since the Constitution was adopted, and if it be true that during that time the Legislature has assumed to infringe a right the exercise of which it had only the right to regulate, that is not a reason for this court to accept legislative perversion as a guide for its high prerogative to expound the Constitution correctly and guard it from violation. This case and others which have been before this

court show that the practice of the Boards of Supervisors of some of the counties has been to levy taxes for the purposes enumerated in sect. 16, Art. XII., of the Constitution, without regard to the limit imposed by the Legislature for the levying of taxes, which shows that the right of the Legislature to limit the amount of taxes as to the subjects named in the constitutional provision has not been acquiesced in by the counties ; and twice has this court declared, in cases presenting the question directly and requiring its decision, that the Boards of Supervisors had the right to disregard the limitation imposed as to these matters. This announcement caused neither revolution nor surprise, and led to no proposal to amend the Constitution in the matter mentioned, although the subject of amending the Constitution has been considered and it has been amended in another matter.

It would seem that the utterances of this court as to the meaning of the Constitution should be entitled to as much respect as the very equivocal action of the Legislature, which may have intended, in the acts passed since the decision, to restrict only as it had the right.

If the argument *ab inconvenienti* is appealed to, and considerations of policy are to be weighed, it is by no means clear that it should be held that the representatives of seventy-four counties, assembled at the seat of government, can better determine as to the scale of expenditure for public necessities in each of the counties than can each county for itself. The exercise of the power by the Legislature to prescribe a rate of taxation for all of the counties may be productive of much mischief. The counties vary widely in population, territory, physical characteristics, and other circumstances. What is sufficient for all the proper purposes of one may be wholly inadequate to the wants of others. A rate of taxation, to be general, must be large enough for those which require most ; and to establish that is to subject those counties needing little to the very evil the existence of which is urged against the possession of power by the counties, independent

of restraint by the Legislature. Authority conferred by an act of the Legislature to raise more by taxation than is necessary is just as harmful as unlimited power derived from the Constitution. Power must be lodged somewhere, and the nearer it is brought to those on whom is to fall the cost of its exercise the better, and that is the principle of sect. 16, Art. XII., of the Constitution. There is danger of unwarranted distrust of Boards of Supervisors, caused by unfortunate experience under unfavorable conditions. The Constitution creates this tribunal and intrusts it with important functions intimately connected with the interests of the people, and within its designated constitutional sphere it is as much entitled to confidence as is the Legislature or this court. Power must be lodged somewhere, and the plan of the Constitution is to give legislative power to the Legislature, but to restrict and limit it in many respects, and among these limitations is that which is contained in sect. 16, Art. XII. In sects. 14 and 15 of that article the Legislature, by name, is prohibited from doing certain things. In sect. 16 the form of expression is more emphatic, as a prohibition to the Legislature, than the two preceding sections.

The decision cited by Judge George from North Carolina, to the effect that counties from time immemorial had possessed the right of local taxation, is a strong argument in favor of the view that the purpose in adopting sect. 16, Art. XII., was to continue this right in the counties and place it beyond denial by the Legislature, securing it as a county right, independent of legislative infringement.